USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 3/01/2019

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
TARELL McILWAIN,

                           Plaintiff,

        -against-

THE CITY OF NEW YORK, JEREMY RAMOS,
SHAWN WILKINSON, and UC #308,

                          Defendants.
-----------------------------------------------------------------X

1:16-cv-3133-GHW

MEMORANDUM OPINION
AND ORDER

GREGORY H. WOODS, United States District Judge:

## I. INTRODUCTION

      Plaintiff Tarell McIlwain walked out of his apartment building wearing a green hoodie, a blue jacket, and silver sneakers. He was arrested at the direction of officers who identified him as the seller in an undercover drug sale that they had just witnessed nearby. At his criminal trial, the officers who witnessed the sale testified that the seller of drugs had been wearing clothing identical to that worn by Plaintiff at the time of his arrest. But the jury evaluated that testimony at Plaintiff's criminal trial and ultimately acquitted Plaintiff.

      Plaintiff brought this action against the three officers who were involved in his arrest, as well as the City of New York, claiming false arrest, malicious prosecution, and denial of his right to a fair trial. Defendants argue that they are protected by qualified immunity, asserting that they had arguable probable cause to arrest Plaintiff principally because, they claim, he was wearing clothing identical to that of the drug seller. There is no dispute that Plaintiff was wearing certain clothing at the time that he was arrested. And there is no dispute that the officer's post-hoc descriptions of the clothing worn by the man that they saw involved in the drug sale matched the clothing worn by Plaintiff that day. But there are substantial issues of fact that call into question whether the officers'

descriptions of the clothing worn by the seller of drugs were true—or if, instead, they represent a false narrative coordinated by the officers after the fact to support their arrest of the wrong man. Because the facts underlying Defendants' claim that arguable probable cause existed are disputed, the Court cannot conclude that Defendants are entitled to qualified immunity, and their motion for summary judgment is DENIED.

## II. BACKGROUND[1]

### A. Factual Background

On February 7, 2015, Detectives Ramos and Wilkinson, and an undercover officer designated "UC #308" ("UC 308") were conducting "buy-and-bust operations" in upper Manhattan as part of a New York Police Department ("NYPD") narcotics team. Defs.' Responsive Statement of Facts ("56.1") (ECF No. 52) ¶¶ 4–5. Detective Ramos was working undercover that day. *Id.* ¶ 4. At around 2:30 p.m., near the intersection of 145th Street and Seventh Avenue, Detective Ramos struck up a conversation about buying drugs with two men, Antonio Jimenez and Elik Johnson. *Id.* ¶ 6. The men told Detective Ramos that they could help him buy crack. Detective Ramos, on the hunt for drug dealers, accepted the offer. *Id.* ¶ 7. The men walked south down Seventh Avenue from 145th Street. *Id.* ¶ 8. Along the way, Messrs. Johnson and Jimenez asked several people for crack, but without luck. *Id.* ¶ 9.

The three men turned at 141st Street, and encountered a man with a dog (the "Seller") near a bodega on the corner of 141st Street and Lenox Avenue. *Id.* ¶ 10. Messrs. Jimenez and Johnson engaged the Seller in a "drug-related conversation." Then the Seller walked into a bodega on the corner of 141st Street and Lenox Avenue, leaving his dog outside with Mr. Jimenez. *Id.* ¶ 11. Shortly thereafter, the Seller walked out of the bodega, handed two small bags of crack to Mr.

---

[1] Except as otherwise noted, the following facts are drawn from Defs.' Responsive Statement of Facts (ECF No. 52) and are undisputed.

Johnson, took his dog back from Mr. Jimenez, and turned onto Lenox Avenue to walk away. *Id.* ¶ 13. Mr. Johnson then gave one of the bags of crack that he had received to Detective Ramos. *Id.* ¶ 14. Detectives Wilkinson and Ramos, and UC 308 all observed the sale and the individuals involved. *Id.* ¶¶ 15–16. Detective Ramos spent at least a minute watching the sale. *Id.* ¶ 51. The sale occurred at about 2:55 p.m., in broad daylight. *Id.* ¶¶ 53, 79.

After the sale, Detective Ramos walked down 141st Street with Messrs. Johnson and Jimenez. *Id.* ¶ 21. The two men entered a building at 109 141st Street. *Id.* ¶ 81. After he separated from the two men, Detective Ramos radioed his team that he had a "positive buy" and provided the description of Messrs. Johnson and Jimenez. *Id.* ¶ 22. He also identified the building into which they had entered. *Id.* ¶ 82.

Detective Ramos also radioed that the Seller had turned off onto Lenox Avenue. *Id.* ¶ 23. Defendants have not asserted, however, that Detective Ramos identified the Seller over the radio with a description other than as a man with a dog—for example, by reference to an article of clothing. *Id.*

UC 308, who also witnessed the sale, and saw the Seller walking north on Lenox Avenue, similarly radioed the team that a "positive buy" had occurred. The officer provided a description of the clothing that each of the three was wearing and stated that the Seller had a dog. *Id.* ¶¶ 24–25. While it is undisputed that UC 308 provided a description of the clothing that the three men were wearing at the time that he radioed his team about the sale, Plaintiff contends that UC 308 did not describe him specifically as wearing clothing matching his description at the time of his arrest. Detective Hiller, who received the radio transmission, testified that he could not recall the description of the clothing that was provided over the radio on the date of the arrest. *Id.* ¶ 26; Decl. of Matthew Stein ("Stein Decl.") (ECF No. 41), Ex E at 101. Thus, while several officers later testified that they observed the Seller wearing clothing similar to that worn by Plaintiff at the time of

3

his arrest, there is no direct evidence before the Court that a description of Seller wearing those clothes was radioed to other members of the team following the arrest.

Messrs. Johnson and Jimenez were apprehended shortly after the sale, at 3:00 p.m., according to the official arrest report. 56.1 ¶¶ 77–78. Detective Ramos had waited down the block from the building that they had entered until he saw the two men being escorted from the building by his fellow officers. *Id.* ¶ 83. Detective Ramos claims that shortly after those men were arrested, he walked to Seventh Avenue between 141st and 142nd Streets. According to Detective Ramos, he then had the good fortune to observe the Seller, with his dog, walk into 2430 Seventh Avenue, a building on the west side of Seventh Avenue. *Id.* ¶ 27.[2]

Sometime after Detective Ramos claims that he saw the Seller walk into 2430 Seventh Avenue, Plaintiff walked out, and two narratives collided.[3] According to Plaintiff, he had not been on the street with a dog selling drugs shortly before his emergence.[4] Instead, he had been in his grandmother's apartment all day. *Id.* ¶ 28. His brother had joined him there earlier in the afternoon. *Id.* ¶ 29. He left for the first time that day in the afternoon between 2:50 and 3:00 p.m., heading out to buy a cigarette. *Id.* ¶ 30.

---

[2] The two buildings are approximately a block apart. Given their locations, one cannot see the front of one building from the other. The Court provides this information merely as context for readers unfamiliar with the neighborhood; these facts are not in the record and are not the basis for the Court's evaluation of this motion.

[3] The parties dispute the amount of time that passed between Detective Ramos' asserted observation of the Seller entering the building and the time of Plaintiff's exit. According to Detective Ramos' deposition and trial testimony, ten minutes elapsed between the time that he saw the Seller enter the building and Plaintiff's exit. *Id.* ¶ 87. According to Detective Ramos' narrative, he witnessed the Plaintiff exiting the building *after* the arrests of Messrs. Johnson and Jimenez. But it is undisputed that Plaintiff left the building between 2:50 and 3:00 p.m. and that Plaintiff was arrested at approximately 3:00 p.m. As discussed below, Plaintiff points to this apparent discrepancy in Detective Ramos' story to argue that the facts underlying the officers' assertions of the existence of arguable probable cause are the product of collusive story telling. Plaintiff poses the valid question of just how Detective Ramos could have watched the arrest of two gentlemen at 3:00 p.m., walked some distance, seen the Seller enter his apartment building, waited ten minutes, and then seen Plaintiff exit and direct his arrest—given that Plaintiff was arrested at the same time as Messrs. Johnson and Jimenez.

[4] Indeed, it is undisputed that at the time, Plaintiff did not own or possess a dog. *Id.* ¶ 45.

4

When Plaintiff walked out of the building, he was wearing a green hoodie, a blue jacket, and silver sneakers. *Id.* ¶ 31. He did not have a dog with him. *Id.* ¶ 33. Plaintiff was accompanied by his brother when he left the building. *Id.* ¶ 30.

After he saw Plaintiff exit the building, Detective Ramos radioed other members of the police team and told them he believed Plaintiff to be the individual who sold drugs to him on the corner of 141st Street and Lenox Avenue. *Id.* ¶¶ 35–36. Plaintiff and his brother were stopped by the officers on 142nd Street between Seventh Avenue and Lenox Avenue. *Id.* ¶ 37. Detective Ramos observed the stop and radioed his team members that "it's going to be the gentleman with the blue jacket." *Id.* ¶ 38. The officers promptly released Plaintiff's brother, but Plaintiff was arrested. He was ultimately indicted on a charge of criminal sale of a controlled substance. *Id.* ¶¶ 39–40.

Later the day of the arrest, Detective Ramos completed a "Buy Report" describing his interactions with the three drug dealers in summary form. Declaration of Michael Lumer ("Lumer Decl.") (ECF No. 47), Ex. 11 (the "Buy Report"). In the Buy Report, Detective Ramos described each of the sellers using a "JD" description. 56.1 ¶ 75. Officers use "JD"—short for John Doe—names to describe people to other officers. *Id.* ¶¶ 65–66. Detective Ramos was taught to use the term "JD" with a descriptive adjective that describes something unique about the person being described. *Id.* ¶ 67. For example, if he "sees a person with green sneakers, [Detective] Ramos will probably use [JD] Green Sneakers, and if he sees a person with visible tattoos, he would probably call them JD Tattoo." *Id.*

In the Buy Report, Detective Ramos described Mr. Johnson using the name "JD Green," and he described Mr. Jimenez using the name "JD Blue." *Id.* ¶ 69. He described the third man involved in the sale using the name "JD Tall." He described the third man as "JD Tall," even though Plaintiff, at 5' 10", is considerably shorter than Messrs. Johnson and Jimenez, who both

5

stand approximately 6' 2". *Id.* ¶¶ 75–76. Detective Ramos did not describe the third man by reference to his dog, or to an item of clothing, even though Detective Ramos later asserted that it was the Seller's silver sneakers and blue coat that caused him to identify Plaintiff as the Seller. *Id.* ¶¶ 72–73. Nor did he describe the third man involved in the drug transaction by reference to Plaintiff's evident facial tattoo, although he had observed the third man closely for at least a minute in broad daylight. *Id.* ¶ 74.

Plaintiff was tried nearly seven months after his arrest. At the trial, Detective Wilkinson testified that he had observed during the drug sale that the Seller—the man with the dog—was wearing a green hoodie, blue jacket, and silver sneakers. *Id.* ¶ 18. Similarly, UC 308 testified that the Seller was wearing a green hoodie, silver sneakers, and a jacket. *Id.* ¶ 17. Detective Ramos testified that the Seller was wearing a blue jacket and silver sneakers. *Id.* ¶ 19. In other words, by the time of trial, all three officers testified that the Seller was wearing clothes identical in description to those that Plaintiff was wearing when he was arrested. Plaintiff argues that—while the officers' testimony was consistent—it was also a fabrication. After all, the officers knew what Plaintiff was wearing when he was arrested, and could coordinate their description of the man they claim they saw selling the drugs to match the description of the man they ultimately arrested. And at his trial, after hearing the officers' testimony, the jury found Plaintiff not guilty on all charges. *Id.* ¶ 40.

### III. PROCEDURAL HISTORY

Plaintiff commenced this action on April 27, 2016, naming Ramu Hiller, Jeremy Ramos, Shawn Wilkinson, UC 308, and the City of New York as defendants. In the complaint, Plaintiff asserted claims for false arrest, malicious prosecution, and denial of his right to a fair trial. *See generally* Compl. (ECF No. 1). After Defendants filed this motion for summary judgment, Defs.' Mem. of Law in Supp. of Mot. for Summ. J. ("Defs.' Mem.") (ECF No. 43), the parties stipulated to the dismissal of Plaintiff's claims against Ramu Hiller, Stip. of Partial Voluntary

6

Dismissal (ECF No. 44). Plaintiff opposed Defendants' motion for summary judgment, Pl.'s Mem. of Law in Opp'n to Defs.' Mot. for Summ. J. ("Pl.'s Mem.") (ECF No. 48), and Defendants submitted a reply in support of their motion for summary judgment, Defs.' Reply Mem. of Law in Supp. of Mot. for Summ. J. ("Defs.' Reply") (ECF No. 53).

## IV. LEGAL STANDARD

Defendants are entitled to summary judgment on a claim if they can "show[] that there is no genuine dispute as to any material fact and [they are] entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) ("[S]ummary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" (quoting former Fed. R. Civ. P. 56(c))). A genuine dispute exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," while a fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*

The movant bears the initial burden of demonstrating "the absence of a genuine issue of material fact," and, if satisfied, the burden then shifts to the non-movant to present "evidence sufficient to satisfy every element of the claim." *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008) (citing *Celotex*, 477 U.S. at 323–24). To defeat a motion for summary judgment, the non-movant—in this case, Plaintiff—"must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)). "[M]ere speculation or conjecture as to the true nature of the facts" will not suffice. *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (internal citation omitted). A plaintiff "must do more than simply show that there is some metaphysical doubt as to the material

facts," *Matsushita*, 475 U.S. at 586, and "may not rely on conclusory allegations or unsubstantiated speculation," *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001) (internal citation omitted).

In determining whether there exists a genuine dispute as to a material fact, the Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (internal citation omitted). The Court's job is not to "weigh the evidence or resolve issues of fact." *Lucente v. IBM Corp.*, 310 F.3d 243, 254 (2d Cir. 2002); *see also Hayes v. N.Y.C. Dep't of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996) ("In applying th[e] [summary judgment] standard, the court should not weigh evidence or assess the credibility of witnesses."). "Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." *Jeffreys v. City of New York*, 426 F.3d 549, 553–54 (2d Cir. 2005) (internal citation omitted). "[T]he judge must ask . . . not whether . . . the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *Id.* at 553 (quoting *Anderson*, 477 U.S. at 252); *see also Battino v. Cornelia Fifth Ave., LLC*, 861 F. Supp. 2d 392, 400 (S.D.N.Y. 2012) ("To avoid summary judgment, all that is required of the non-moving party is a showing of sufficient evidence supporting the claimed factual dispute as to require a . . . jury's resolution of the parties' differing versions of the truth." (citing *Kessler v. Westchester Cty. Dep't of Soc. Servs.*, 461 F.3d 199, 206 (2d Cir. 2006))).

V. **DISCUSSION**

   a. **False Arrest**

The Court cannot conclude that Defendants are entitled to qualified immunity for Plaintiff's false arrest claims because on this record because the undisputed facts do not establish the existence of arguable probable cause. Defendants argue that they are entitled to qualified immunity because

arguable probable cause existed for Plaintiff's arrest.[5] Defendants point principally to the fact that Plaintiff's clothing matched their description of the Seller's clothing—combined with the location of the arrest—as the basis for the existence of arguable probable cause. Defs.' Mem. at 8. But because those facts are disputed, the Court cannot conclude that arguable probable cause exists on this record.

In analyzing claims for false arrest brought under § 1983, courts in this circuit "generally look[ ] to the law of the state in which the arrest occurred." *Russo v. City of Bridgeport*, 479 F.3d 196, 203 (2d Cir. 2007) (quoting *Davis v. Rodriguez*, 364 F.3d 424, 433 (2d Cir. 2004)). "A section 1983 claim for false arrest is substantially the same as a claim for false arrest under New York law." *Simpson v. City of New York*, 793 F.3d 259, 265 (2d Cir. 2015) (quoting *Jenkins v. City of New York*, 478 F.3d 76, 84 (2d Cir. 2007)). To state a claim for false arrest under New York law, a plaintiff must show that: "(1) the defendant intended to confine [the plaintiff], (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement, and (4) the confinement was not otherwise privileged." *Singer v. Fulton Cnty. Sheriff*, 63 F.3d 110, 118 (2d Cir. 1995) (internal quotation marks omitted).

"The existence of probable cause to arrest . . . is a complete defense to an action for false arrest, whether that action is brought under state law or under § 1983." *Gonzalez v. City of Schenectady*, 728 F.3d 149, 155 (2d Cir. 2013) (quoting *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996)) (internal quotation marks and citation omitted). "[P]robable cause to arrest exists when the officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to

---

[5] Among other things, Defendants did not move for summary judgment with respect to any of the Defendants' personal involvement in the challenged actions. For example, it is not apparent that Detective Wilkinson was personally involved in Plaintiff's arrest. *Farid v. Ellen*, 593 F.3d 233, 249 (2d Cir. 2010) (stating that the "personal involvement of defendants in alleged constitutional deprivations is a prerequisite" to recovery under Section 1983 (citing *Farrell v. Burke*, 449 F.3d 470, 484 (2d Cir. 2006)). However, because Defendants did not move for summary judgment on the basis of any officers' lack of personal involvement, Plaintiff's false arrest claim proceeds as to all defendants.

warrant a person of reasonable caution in the belief that the person to be arrested has *committed or is committing* a crime." *Id.* (emphasis in original). The test for probable cause is an objective one and "depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest." *Zellner v. Summerlin*, 494 F.3d 344, 369 (2d Cir. 2007) (internal citation omitted). "[W]hether or not probable cause existed may be determinable as a matter of law if there is no dispute as to the pertinent events and the knowledge of the [arresting] officers." *Weyant*, 101 F.3d at 852.

"[A]n arresting officer is entitled to qualified immunity on claims of false arrest and malicious prosecution if either: (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met." *Carthew v. County of Suffolk*, 709 F. Supp. 2d 188, 203 (E.D.N.Y. 2010) (citing *Walczyk v. Rio*, 496 F.3d 139, 163 (2d Cir. 2007)); *see also Simpson v. City of New York*, 793 F.3d 259, 268 (2d Cir. 2015) (stating that an officer need only have "arguable probable cause," which exists if either it was objectively reasonable to believe that probable cause existed or if officers of reasonable competence could disagree on whether probable cause existed); *Posr v. Court Officer Shield #207*, 180 F.3d 409, 416 (2d Cir. 1999)).

The Second Circuit has referred to the latter category as "arguable probable cause" and described it as follows:

> Arguable probable cause exists when a reasonable police officer in the same circumstances and possessing the same knowledge as the officer in question *could* have reasonably believed that probable cause existed in the light of well established law. It is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present, and we have indicated that in such cases those officials—like other officials who act in ways they reasonably believe to be lawful—should not be held personally liable.

*Cerrone v. Brown*, 246 F.3d 194, 202–03 (2d Cir. 2001) (internal quotation marks and citations omitted) (emphasis in original). "This forgiving standard protects 'all but the plainly incompetent or

those who knowingly violate the law.'" *Provost v. City of Newburgh*, 262 F.3d 146, 160 (2d Cir. 2001) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). Courts may deny motions for summary judgment on qualified immunity grounds only where an officer's judgment was "so flawed that no reasonable officer would have made a similar choice." *Id.* (internal citation omitted). In the end, qualified immunity "protects government officials when they make 'reasonable mistakes' about the legality of their actions." *Doninger v. Niehoff*, 642 F.3d 334, 353 (2d Cir. 2011) (quoting *Saucier v. Katz*, 533 U.S. 194, 206 (2001)).

To assess whether there was arguable probable cause for an arrest, courts are reminded that police officers are "entitled to draw reasonable inferences from the facts they possess at the time of a seizure based upon their own experiences." *Cerrone*, 246 F.3d at 203. Where conflicting versions of the facts exist, however, an officer is entitled to qualified immunity only if "the *undisputed facts* and all permissible inferences favorable to the plaintiff show . . . that officers of reasonable competence could disagree on whether the probable cause test was met." *Robison v. Via,* 821 F.2d 913, 921 (2d Cir. 1987) (emphasis added).

Here, the undisputed facts do not establish the existence of probable cause or arguable probable cause. As noted above, Defendants rest their argument on the cohesive statements by the officers regarding the description of the Seller as an African American man wearing particular clothing at the time of the sale, as well as their statements regarding the general location of Plaintiff's arrest near the location of the drug sale. But there are sufficient facts in the record to put their account in dispute.

Plaintiff has stated that he was in his grandmother's apartment until the time that he exited the apartment and was arrested. It is undisputed that he did not own or possess a dog. Plaintiff left the apartment wearing a green hoodie, a blue jacket, and silver sneakers, and was arrested wearing those clothes. The officers claim that they should be protected by arguable probable cause because

11

they all say that they saw the Seller wearing similar clothing. But substantial issues exist regarding the veracity of their descriptions of the Seller.

Specifically, Plaintiff has presented a number of inconsistent facts supporting an inference that Defendants lied when they stated that the Seller was wearing the same attire as Plaintiff. One such inconsistency is found in Detective Ramos' use of the name "JD Tall" to describe the Seller. As noted above, Plaintiff is 4 inches shorter than Messrs. Johnson and Jimenez. Plaintiff argues that this suggests that the Seller was likely a taller man than he. Plaintiff also points out that the "JD" name used by Detective Ramos did not identify the Seller by a piece of clothing, supporting an inference that the Seller was not wearing a distinctive piece of clothing at the time. At the same time, Detective Ramos gave Mr. Johnson the name "JD Green" and Mr. Jimenez the name "JD Blue," even though Detective Ramos later stated that the Seller was wearing both blue and green articles of clothing. The names that Detective Ramos gave to those men support an inference that the Seller was not wearing clothing of either color—otherwise the descriptive nicknames given to JD Green and JD Blue would not have identified unique characteristics of those men.

Moreover, Detective Ramos commented on a feature of the Seller's face—his "patchy beard"—but did not note any facial tattoos. Detective Ramos conceded that if a suspect had visible tattoos, he would likely name the suspect "JD Tattoo." 56.1 ¶ 67. These facts again support an inference that the Seller did not look like Plaintiff: Plaintiff has multiple facial tattoos. *Id.* ¶ 46.

In the face of this series of discrepancies, the fact that the defendant officers described the Seller as wearing clothes similar to those worn by Plaintiff when he was arrested is not sufficient to establish the existence of probable cause or even arguable probable cause. Simply because all of the officers provided a coordinated account of events does not necessarily mean that the account was true—here, Plaintiff has presented sufficient evidence to put Defendants' version of events in dispute.

The timeline of events also raises questions about the accuracy of the officers' statements—particularly about Detective Ramos' statements regarding the location where he saw the Seller enter and Plaintiff later exit. As noted above, the arrest report states that all of the people arrested for the drug sale—Messrs. Johnson, Jimenez, and Plaintiff—were arrested at 3:00 p.m. *Id.* ¶¶ 77–78. It is undisputed that Plaintiff exited his grandmother's apartment at around that time. But Detective Ramos' narrative contains internal inconsistencies that call his credibility into question. The drug sale reportedly occurred at approximately 2:55 p.m. *Id.* ¶ 79. After the sale, Detective Ramos testified that he watched from down the block while his fellow officers arrested Messrs. Johnson and Jimenez. *Id.* ¶ 83. Detective Ramos testified that he then walked to Seventh Avenue, and that approximately ten to fifteen minutes *after* the 2:55 p.m. transaction, he saw the Seller entering an apartment building. *Id.* ¶ 85. Detective Ramos testified that approximately ten minutes *after that*, he observed Plaintiff and another man emerge from the same apartment building. *Id.* ¶ 87. Plaintiff and his brother then walked a short distance before police officers stopped and detained them. *Id.* ¶ 89.

Crediting Detective Ramos' account, Plaintiff's arrest would have occurred significantly later than 3:00 p.m., the time of arrest stated in the arrest report. Defendants counter that the times were approximate and that the officers testified that they were "not too sure of the [amount of] time." *See e.g.*, *id.* ¶ 85 (alteration in original). But the fact that the arrest report states that Plaintiff was arrested at the same time as Messrs. Jimenez and Johnson, supports an alternative inference that Detective Ramos' narrative in which he fortuitously viewed the Seller enter the building after watching his colleagues' arrest, then waited until Plaintiff exited was false. In fact, that narrative would have to be false if all of the people involved in the drug sale were arrested at the same time, as reflected in the arrest report.

13

Resolving all ambiguities and drawing all factual inferences in favor of Plaintiff, the discrepancies with respect to the post-arrest description of the Seller and the timing of the February 7, 2015, arrests illustrate the genuine disputes regarding the facts that existed at the time of Plaintiff's arrest.  The discrepancies call into question the accuracy and veracity of the officers' accounts and require an assessment of the credibility of the officers' description of the facts. "Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." *Jeffreys*, 426 F.3d at 553–54 (internal citation omitted).  Because facts necessary to determine whether probable cause or arguable probable cause existed at the time of Plaintiff's arrest are in dispute, the Court cannot conclude that the officers are entitled to qualified immunity on this record.

b. **Malicious Prosecution**

For substantially the same reasons, the Court cannot conclude that Defendants are entitled to qualified immunity with respect to Plaintiff's malicious prosecution claim.  The elements of a malicious prosecution claim under Section 1983 are virtually identical to the elements of the same claim under New York law.  *Hygh v. Jacobs*, 961 F.2d 359, 366 (2d Cir. 1992).  A malicious prosecution claim under New York law requires the plaintiff to prove "(1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions." *Jocks v. Tavernier*, 316 F.3d 128, 136 (2d Cir. 2003) (internal quotation marks and citations omitted).  In addition to the state law elements of malicious prosecution, "[t]o sustain a § 1983 malicious prosecution claim, there must be a seizure or other perversion of proper legal procedures implicating the claimant's personal liberty and privacy interests under the Fourth Amendment." *Washington v. County of Rockland*, 373 F.3d 310, 316 (2d Cir. 2004) (internal quotation marks omitted).

As with a false arrest claim, the existence of probable cause is a complete defense to a claim of malicious prosecution. *Savino v. City of New York*, 331 F.3d 63, 72 (2d Cir. 2003). In the malicious prosecution context, probable cause is defined as "the knowledge of facts, actual or apparent, strong enough to justify a reasonable man in the belief that he has lawful grounds for prosecuting the defendant in the manner complained of." *Rounseville v. Zahl*, 13 F.3d 625, 629 (2d Cir. 1994) (internal quotation marks omitted). "Unlike an arrest, which only requires probable cause that 'the suspect had committed . . . an offense[,]' a prosecution requires probable cause 'to charge [the suspect] with *each* of the crimes.'" *Kavazanjian v. Rice*, No. 03-CV-1923 (FB)(SMG), 2005 WL 1377946, at *4 (E.D.N.Y. June 6, 2005) (emphasis in original) (quoting *Lowth v. Town of Cheektowaga*, 82 F.3d 563, 569, 571 (2d Cir. 1996)). "The existence, or lack, of probable cause is measured at a different point in time in a malicious prosecution action than a false arrest action, where the prosecution follows a warrantless arrest." *Jackson v. City of New York*, 939 F. Supp. 2d 235, 251 (E.D.N.Y. 2013) (internal quotation marks and citations omitted). "Thus, information discovered by a malicious prosecution defendant after the arrest, but before the commencement of proceedings, is relevant to the determination of probable cause in cases where the prosecution follows a warrantless arrest." *Id.* (internal quotation marks and citations omitted).

"[U]nder New York law, indictment by a grand jury creates a presumption of probable cause that may only be rebutted by evidence that the indictment was procured by 'fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith.'" *Savino v. City of New York*, 331 F.3d 63, 72 (2d Cir. 2003) (quoting *Colon v. City of New York*, 60 N.Y.2d 78, 83 (1983)). Accordingly, in order to survive a motion for summary judgment on a malicious prosecution claim, a plaintiff "must have submitted evidence sufficient for a reasonable jury to find that his indictment was procured as a result of police conduct undertaken in bad faith." *Id.* at 73.

Defendants correctly point out that "[w]here plaintiff's only evidence is his own version of events, courts have found that such evidence amounts to nothing more than 'mere conjecture and surmise that [the plaintiff's] indictment was procured as a result of conduct undertaken by the defendants in bad faith,' and thus insufficient to rebut the presumption of probable cause created by the indictment." *Garnett v. City of New York*, No. 13-cv-7083-GHW, 2014 WL 3950904, at *10 (S.D.N.Y. Aug. 13, 2014) (quoting *Savino*, 331 F.3d at 73), *aff'd sub nom. Garnett v. Undercover Officer C0039*, 838 F.3d. 265 (2d Cir. 2016). But this is not such a case.

Here, Plaintiff has "submitted evidence sufficient for a reasonable jury to find that his indictment was procured as a result of police conduct undertaken in bad faith." *Savino*, 331 F.3d at 73. In addition to his testimony that he never left the apartment, and that he did not own or possess a dog, Plaintiff has produced evidence of several discrepancies that call into question the officers' narrative. Among those facts are Detective Ramos' failure to note Plaintiff's facial tattooing, the discrepancies in his use of JD names, and the inconsistencies between Detective Ramos' narrative of events and the arrest report described above. Pl.'s Mem. at 18–19; *see* 56.1 ¶¶ 56–63, 72–76, 78–85, 88. These inconsistencies in the officers' testimony and reports could lead a reasonable jury to conclude that the officers provided false or misleading evidence to the district attorney to procure the indictment of Plaintiff. This is sufficient to rebut the presumption of probable cause created by the grand jury's indictment. *See, e.g.*, *Rothstein v. Carriere*, 373 F.3d 275, 283 (2d Cir. 2004) ("The presumption may be overcome only by evidence establishing that the police witnesses have not made a complete and full statement of facts either to the Grand Jury or to the District Attorney, that they have misrepresented or falsified evidence, that they have withheld evidence or otherwise acted in bad faith." (citing *Colon*, 60 N.Y.2d at 82–83)).

The Court cannot conclude that Defendants are entitled to qualified immunity with respect to this claim either because, as explained above, facts necessary to determine whether probable cause

or arguable probable cause existed—namely, the veracity and credibility of Defendants' description of the Seller and their identification of Plaintiff, and the accuracy of the timeline of events reflected by the officers' post-arrest accounts—are in dispute. As a result, Defendants' motion for summary judgment on this ground must be denied.

### c. Denial Of Right To Fair Trial

The Court is unable to grant Defendants motion for summary judgment with respect to Plaintiff's claim for denial of his right to a fair trial because Plaintiff has presented sufficient evidence for a reasonable jury to conclude that Defendants fabricated information that was likely to influence the jury's verdict. "When a police officer creates false information likely to influence a jury's decision and forwards that information to prosecutors, he violates the accused's constitutional right to a fair trial, and the harm occasioned by such an unconscionable action is redressable in an action for damages under 42 U.S.C. § 1983." *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 130 (2d Cir. 1997). To establish a claim for denial of the right to a fair trial, a plaintiff must show that (1) an investigating official (2) fabricated information (3) that is likely to influence a jury's verdict, (4) forwards that information to prosecutors, and (5) the plaintiff suffers a deprivation of life, liberty, or property as a result. *Garnett v. Undercover Officer C0039*, 838 F.3d 265, 279 (2d Cir. 2016). The existence of probable cause is not a defense. *Id.* at 277–78 (holding that "a Section 1983 claim for the denial of a right to a fair trial based on an officer's provision of false information to prosecutors can stand even if the officer had probable cause to arrest the Section 1983 plaintiff"); *see Ricciuti*, 124 F.3d at 130.

In their motion for summary judgment, Defendants assert that "Plaintiff offers no proof that any of the defendant officers fabricated evidence in this case," and then proceed to their arguments regarding qualified immunity. Defs.' Mem. at 13. But, as described above, here Plaintiff submitted evidence and highlighted a range of inconsistencies in the officers' accounts. Drawing all

17

inferences in Plaintiff's favor, these discrepancies call into question the veracity of the officers' accounts and place this critical question into dispute. As a result, the Court is unable to grant Defendants' motion for summary judgment with respect to Plaintiff's claim for the denial of his right to a fair trial.

Because Plaintiff has presented evidence that raises a genuine issue regarding the question of whether Defendants knowingly fabricated evidence to bolster their case against Plaintiff, Defendants are also not entitled to qualified immunity with respect to Plaintiff's claim for the denial of his right to a fair trial. *See, e.g.*, *Morse v. Fusto*, 804 F.3d 538, 550 (2d Cir. 2015) (holding that qualified immunity is unavailable on "a claim for denial of the right of a fair trial where the claim is premised on proof that a defendant knowingly fabricated evidence and where a reasonable jury could so find"); *Robinson v. City of New York*, No. 15 CIV. 5850 (LGS), 2017 WL 2414811, at *6 (S.D.N.Y. June 2, 2017) ("Because fabrication of evidence violates a clearly established constitutional right, defendant officers are not entitled to qualified immunity." (internal alterations, quotation marks, and citation omitted)); *Harris v. City of New York*, 222 F. Supp. 3d 341, 352 (S.D.N.Y. 2016) (holding that Plaintiff's claim for denial of his right to a fair trial could not "be summarily dismissed on the ground of qualified immunity, because no reasonable police officer could have thought that telling the District Attorney's office that Plaintiff possessed the 'weapon' when the police had no such evidence was permissible police behavior").

### d. Claim Against The City of New York

Defendants' only argument for granting summary judgment on Plaintiff's claims against the City of New York is that their motion for summary judgment should be granted as to Plaintiff's claims against the individual officers. For the reasons described above, Defendants' motion for summary judgment against the individual officers is denied. Having been presented with no other

basis to grant summary judgment as to the claims against the City of New York, Defendants' motion is denied in that respect as well.

## VI. CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is DENIED. The Clerk of Court is directed to close the motion pending at ECF No. 40.

SO ORDERED.

Dated: March 1, 2019
New York, New York

_____
GREGORY H. WOODS
United States District Judge